CITY OF OAKLAND 

POLICE ADMINISTRATION BUILDING · 455 - 7TH STREET · OAKLAND, CALIFORNIA 94607-3985

Police Department

October 18, 2005

Telephone Device for the Deaf (510) 777-3333
Patrol Desk (510) 238-3455
Fax (510) 238-2251

Honorable Thelton E. Henderson
Judge of the United States District Court
450 Golden Gate Avenue
San Francisco, California 94102

Dear Judge Henderson:

In regards to the concerns on the Oakland Police Department's implementation of the Crowd Control and Crowd Management Policy, let me assure you that the process of publication and distribution and the scheduling of training is underway. I addressed the concerns expressed to you by Ms. Rachel Lederman in a previous letter, a copy of which is attached for your reference.

Since receiving the final edits from plaintiffs' counsel on May 19, 2005, the formatting, publishing, and printing of the Training Bulletin was assigned to the Training Division on May 24, 2005. Due to the priority publication, distribution, and training of Negotiated Settlement Agreement tasks, as well as the renewed emphasis on hiring, planning, coordinating, and scheduling several police academies, the Crowd Control and Crowd Management Training Bulletin process was slowed. Nevertheless, elements and aspects of the Crowd Control Policy, as well as from lessons learned, have been incorporated, since May 2004, into our Major Response Operations and Special Events planning and briefings prior to officers' assignment to the field.

The Oakland Police Department is committed to formally implementing this policy. The following implementation timeline demonstrates this commitment:

- ♦ I have reviewed and approved the Training Bulletin as official Departmental policy. Enclosed is the Training Bulletin I have approved.

- ♦ A draft lesson plan was reviewed and commented on by subject matter experts on October 5, 2005. The final lesson plan will be reviewed and approved by same no later than October 21, 2005.

- ♦ The Training Bulletin is expected to be published on or before October 28, 2005. Copies will be sent to each Unit Commander for personal preparation prior to their training. Unit Commanders will make individual

distribution to each Sergeant and Police Officer at their respective trainings.

♦ "Train the Trainer" instruction for Commanders will occur on two separate Command Training Days held on November 15 and 17, 2005.

♦ Tactical Team members will be instructed on their regularly scheduled Training Day on December 6, 2005.

♦ Commanders shall be responsible for ensuring that training for supervisors and officers within their Divisions is completed.  This comprehensive training is expected to commence on or about November 16, 2005 and be completed prior to January 31, 2005.

♦ Refresher training for each and every officer assigned to planned Major Response Operations and Special Events will continue to be conducted as part of each operations briefing (i.e. Cinco de Mayo, Labor Day, Memorial Day, Fourth of July, New Years Eve, Raiders games).

If you have any further questions or concerns please feel free to contact me directly at (510) 238-3365 or Deputy Chief Gregory A. Lowe at (510) 238-3801.

Sincerely,

Wayne G. Tucker
Chief of Police

WGT: rwy

Cc:     DCA Rocio Fierro
        Mr. Gregory Fox
        Ms. Rachel Lederman
        Mr. James Chanin
        Mr. John Burris

September 30, 2005


Rachel Lederman
Attorney at Law
558 Capp Street
San Francisco, CA 94110

Dear Ms. Lederman:

In regards to your concerns regarding the Oakland Police Department's implementation of the Crowd Control Policy, let me assure you that the process of publication and training is underway. Your concerns and our responses are as follows:

*Verification that the Training Bulletin we have agreed on has been signed, published and disseminated to each OPD officer.*

- Since receiving the final edits from plaintiffs' counsel on May 19, 2005, the formatting, publishing, and printing of the Training Bulletin was assigned to the Training Division.

- A draft lesson plan is currently out for review by subject matter experts, with a discussion scheduled for October 5, 2005.

- My review of the Training Bulletin will occur by October 7, 2005.

- Publication will occur on or before October 28, 2005.


*An unequivocal official statement from Chief Tucker that the Training Bulletin constitutes official OPD policy.*

Former Chief Richard Word approved the Crowd control policy negotiated between OPD and the plaintiffs. Then Deputy Chief Peter Dunbar reaffirmed that it was OPD policy. I also affirm that this Training Bulletin constitutes official policy. Elements and aspects of the Crowd Control Policy, as well as from lessons learned, have been incorporated, since May 2004, into our Major Response Operations and Special Events planning.

Effective with the signing of this letter, I affirm that this Training Bulletin shall be used to advise members of current police techniques and procedure and shall constitute official policy regarding crowd management and crowd control.


*A draft lesson plan for our review.*

Please find attached.

*An iron clad schedule for training to be submitted to the court, with specifics for how and when each and every officer will be trained in the new policy.*

As stated above, elements and aspects of the Crowd Control Policy, as well as from lessons learned, have been incorporated, since May 2004, into our Major Response Operations and Special Events planning; activities involving large crowd management issues.

The Training Bulletin is expected to be published and reviewed by me by October 14, 2004. Training for Command Staff and Tactical Team members will be first priority. Following that, training for all other supervisors and officers will be provided (i.e. Patrol Lineups, Continuing Professional Training Seminars, Basic and Lateral Academies, Unit briefings). This comprehensive training is expected to be completed prior to January 31, 2006. Again, let me repeat that each and every officer assigned to planned Major Response Operations and Special Events receives training on the policy.

If you have any further questions or concerns please feel free to contact Deputy Chief Gregory A. Lowe at (510) 238-3801, Deputy City Attorney Rocio Fierro at (510) 238-6511 or Mr. Gregory Fox at (415) 353-0999.

Sincerely,


Wayne G. Tucker
Chief of Police

WGT: rwy

Cc:     DCA Rocio Fierro
        Mr. Gregory Fox

<table>
<tr><td>

# TRAINING

</td><td>



</td><td>

# BULLETIN

</td></tr>
</table>

| | |
|---|---|
| Date of Issue / Revision:<br>dd mm yy | Index Number: X-X<br>Alpha Index:  Crowd Control  and<br>Crowd Management Policy |

*"Department Training Bulletins shall be used to advise members of current police techniques and procedures
and shall constitute official policy."*
*Department General Order A—7; 21 July 1989*

## OPD Crowd Control and Crowd Management Policy

The purpose of this Training Bulletin is to set forth policy and procedures regarding crowd
management and crowd control.

I. Policy

The Oakland Police Department crowd management and crowd control policy is to
o   apply the appropriate level of direction and control to protect life, property, and vital
    facilities;
o   maintain public peace and order; and
o   uphold constitutional rights of free speech and assembly
while relying on the minimum use of physical force and authority required to address a crowd
management or crowd control issue.

II. Definitions

    A.      Crowd Management

           Crowd management is defined as techniques used to manage lawful public
           assemblies before, during, and after an event for the purpose of maintaining the
           event's lawful status.  Crowd management can be accomplished in part through
           coordination with event planners and group leaders, permit monitoring, and past
           event critiques.

    B.      Crowd Control

           Crowd control is defined as those techniques used to address unlawful public
           assemblies, including a display of formidable numbers of police officers, crowd
           containment, dispersal tactics, and arrest procedures.

    C.      First Amendment Activities

1

First Amendment activities include all forms of speech and expressive conduct used to convey ideas and/or information, express grievances, or otherwise communicate with others and include both verbal and non-verbal expression.

Common First Amendment activities include, but are not limited to, speeches, demonstrations, vigils, picketing, distribution of literature, displaying banners or signs, use of puppets to convey a message, street theater, and other artistic forms of expression. All these activities involve the freedom of speech, association, and assembly and the right to petition the government, as guaranteed by the United States Constitution (First Amendment) and the California Constitution (Article 1, Sections 2 & 3).

All persons have the right to march, demonstrate, protest, rally, or perform other activities protected by the First Amendment of the United States Constitution and the California Constitution.

The government may impose reasonable restrictions on the time, place or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

D.    Demonstration

Demonstration is used generically in this Training Bulletin to include a wide range of First Amendment activities which require, or which may require, police traffic control, crowd management, crowd control, crowd dispersal, or enforcement actions in a crowd situation.

As used in this Training Bulletin, the term, demonstration means, a public display of group's or individual's feeling(s) toward a person(s), idea, cause, etc and includes, but is not limited to, marches, protests, student walk-outs, assemblies, and sit-ins. Such events and activities usually attract a crowd of persons including participants, onlookers, observers, media, and other persons who may disagree with the point of view of the activity.

E.    Crowd Event or Crowd Situation

This Training Bulletin pertains to crowd events or crowd situations, including sporting events, festivals, concerts, celebratory crowds, and demonstrations as defined above.

III.    General Principles

The Oakland Police Department's Crowd Management/Crowd Control Policy consists of the general principles discussed below.

2

A.   Planning

    1.    Command staff shall be notified immediately of large or potentially disruptive demonstrations and/or crowd events.

    2.    The Incident Commander shall be responsible for the development of a written operations plan.

    3.    The Incident Command System shall be used for managing crowds and acts of civil disobedience.

    4.    OPD shall make every effort to follow the principle of establishing contact and communication with the event or demonstration planners.

        Stakeholder involvement is critical to the overall success of managing crowd events and/or civil disobedience during demonstrations. If knowledge exists that a demonstration or crowd event may happen or will happen, OPD shall proactively and repeatedly make every reasonable attempt to establish and to maintain communication and cooperation with representatives or leaders of the demonstration or crowd event, without regard to whether a permit has been applied for or issued.

        When planning for and responding to demonstrations, crowd events, and civil disobedience situations, Incident Commanders assigned to these incidents shall facilitate the involvement of stakeholders. If and when communication is established, personnel shall make every effort to identify representatives or leaders of the event and identify a primary police liaison. The primary police liaison should be requested to be in continuous contact with an assigned police representative, preferably the Incident Commander or someone with continuous access to the Incident Commander.

        A group's failure to respond to OPD attempts to establish communication and cooperation prior to a demonstration shall not mitigate OPD's efforts to establish liaison and positive communication with the group as early as possible at the scene of the demonstration or crowd event.

    5.    Spontaneous demonstrations or crowd events, which occur without prior planning and/or without prior notice to the police, present less opportunity for OPD planning and prevention efforts. Nonetheless, the same policies and regulations concerning crowd management, crowd control, crowd dispersal, and police responses to violence and disorder apply to a spontaneous demonstration or crowd event situation as to a planned demonstration or crowd event. Incident Commanders shall involve

3

representatives of demonstrators or crowd events when planning and responding to both planned and spontaneous events.

B.   Deployment

    1.   Decisions about crowd dispersal and general strategies about crowd containment or crowd redirection, multiple simultaneous arrests, planned individual arrests, or planned use of force shall be made at the level of the Incident Commander or higher.

        a)   If such decisions are made by higher ranking off-site OPD officials, it is required that the Incident Commander first be consulted about the state of affairs in the field and the potential consequences of the decision.

        b)   All such decisions shall be documented in writing with regard to time, the identity of the person making the decision, and the precise decision and directions given. Such documentation shall be made at the time of the decision or as soon thereafter as possible and included in an After Action Report.

        This directive shall not preclude individual commanders, supervisors, and officers from defending themselves or others from imminent danger when the delay in requesting permission to take action would increase the risk of injury.

    2.   OPD recognizes that the designated police liaison may change during the course of an event and that leadership of certain groups may not exist nor desire to be identified. No retaliatory practices or adverse action shall be taken by OPD against a group because it has failed or refused to appoint a police liaison or otherwise establish lines of communication with OPD.

    3.   Communication with the identified police liaison shall continue even if enforcement actions commence.

    4.   As staffing permits, officers should be deployed to the best available vantage points to observe and report crowd actions.

    5.   Lines of control should be established, especially in events that involve protesters with opposing views. Whenever possible, hostile factions should be separated.

    6.   Considering the type of crowd involved is an important factor in responding properly to its behavior.

Crowds may vary from cooperative or celebratory to non-compliant, hostile, and combative. Organized demonstrations in which some engage in coordinated, nonviolent civil disobedience should be distinguished, to the extent possible, from crowds in which substantial numbers of people are engaged in other types of unlawful acts.

C.    Policing a Crowd

1.    Sufficient resources to make multiple simultaneous arrests should be available at demonstrations where such arrests are a reasonable possibility. However, this need must be balanced against the fact that a large and visible police presence may have a chilling effect on the exercise of free speech rights.

Where additional resources are needed, they should be deployed to the greatest extent possible so they are not readily visible to the crowd. When possible, officers should be at their posts well in advance of arriving participants. If possible, officers should be positioned at a reasonable distance from the crowd to avoid a perception of intimidation.

2.    In general, OPD officers shall work together in squads or platoons when policing a demonstration.

3.    Each officer shall wear a badge, nameplate, or other device on the outside of his or her uniform or on his or her helmet which bears the identification number or the name of the officer, as required by Penal Code § 830.10.

The number or name shall be clearly visible at all times. The letters or numerals on helmets, jackets, and vests shall be clearly legible at a distance sufficient to provide a measure of safety for both officers and demonstrators/observers and, in no case, shall be less than two inches in height on helmets.

4.    Crowd control and crowd dispersal, as well as a show of force in crowd control situations, should be accomplished whenever possible using special details of OPD officers rather than on-duty patrol officers.

5.    Regardless of whether a parade permit has been obtained, OPD officers will try to facilitate demonstrations that may temporarily block traffic and/or otherwise use public streets subject to time, place, and manner of circumstances, by regulating and/or rerouting traffic as much as practical.

For a demonstration without a pre-planned route, the Incident Commander shall evaluate the size of the crowd with regard to whether demonstrators should be required to stay on the sidewalk or whether demonstrators should be allowed to be in one or more lanes of traffic.

This directive does not mean demonstrations must be allowed to deliberately disrupt commuter traffic and/or bridge approaches.

The Incident Commander shall balance the level of disruption to traffic against the OPD policy of facilitating First Amendment activity, the practicality of relegating the crowd to sidewalks or an alternate route, the expected duration of the disruption, and the traffic disruption expected in making multiple, simultaneous arrests if demonstrators refuse to leave the street.

OPD shall seek to communicate with organizers through their police liaison to resolve a problem if possible. Traffic control may also be essential at varying points in a demonstration and may help accomplish crowd containment, crowd isolation, or crowd dispersal.

6.     It is essential to recognize that all members of a crowd of demonstrators are not the same.

Even when some members of a crowd engage in violence or destruction of property, other members of the crowd are not participating in those acts. Once some members of a crowd become violent, the situation often turns chaotic, and many individuals in the crowd who do not want to participate in the violent or destructive acts may be blocked from leaving the scene because the crowd is so large or because they are afraid they will move into a position of heightened danger.

This understanding does not mean OPD cannot take enforcement action against the crowd as permitted under this policy, but OPD shall seek to minimize the risk that force and arrests may be directed at innocent persons.

7.     OPD officers shall avoid negative verbal engagement with members of the crowd.

Verbal abuse against officers shall not constitute a reason for an arrest or for any use of force against such individuals.

8.     Officers must not be affected by the content of the opinions being expressed nor by the race, gender, sexual orientation, physical disabilities, appearances, or affiliation of anyone exercising their lawful rights.

9.     Department personnel must maintain professional demeanor and remain neutral in word and deed despite unlawful or anti-social behavior on the part of crowd members. Unprofessional police behavior can inflame a tense situation and make control efforts more difficult and dangerous.

Strong supervision and command are essential to maintaining unified, measured, and effective police response. A response incorporating strong leadership and based upon teamwork is crucial to maintaining control and safety. Impulsive or independent actions by officers are to be avoided.

10.     Officers in non-violent crowd situations shall not display weapons as a means to intimidate the crowd before      a dispersal order is given or other enforcement action is implemented.

11.     OPD officers shall not be sent into an obviously hostile crowd solely for the purpose of communication.  OPD officers shall not penetrate a crowd for an individual arrest unless the targeted individual is involved in serious criminal conduct and the decision to move into the crowd is made by a supervisor or commander.

12.     The Incident Commander and supervisors shall make every effort to ensure that the police mission is accomplished as efficiently and unobtrusively as possible with the highest regard for the human dignity and liberty of all persons and with minimal reliance on the use of physical force.

The use of force shall be restricted to circumstances authorized by law and to the degree reasonably necessary in light of the circumstances confronting members.  This directive does not preclude police officers from taking appropriate action to direct crowd and vehicular movement; enforce ordinances and statutes; and employ the physical force necessary to maintain the safety of the crowd, the general public, law enforcement personnel, and emergency personnel.

IV.     Responses to Crowd Situations

A.     Spontaneous Event or Incident

1.     The Watch Commander shall respond to the scene of spontaneous events, when practical, and take command of the incident as the Incident Commander until relieved by a ranking officer.

The Incident Commander shall declare over the police radio that he or she has assumed command of the incident. When practical, a command post shall be established as soon as possible.

2.     An immediate assessment of the situation is essential for effective police response.  The Incident Commander must ascertain the following information at the earliest possible time:

7

a. The location and type of event.

b. First Amendment activities will be evaluated by the Incident Commander to determine lawfulness of the actions by groups and individuals.

c. The approximate number of specific individuals engaged in unlawful conduct.

d. The likelihood that unlawful behavior will spread to other crowd participants (mimicking).

e. Immediate threats to the safety of the public and/or police officers.

f. The number of structure(s) or vehicle(s) involved.

g. The size of the involved area.

h. The number of additional officers and police resources needed as well as requirements for specialized units (Traffic, Tactical Operations Team, Crime Reduction Teams, etc.)

i. The appropriate manner of response (Code 2 or 3).

j. The staging areas.

k. The location for a media staging area.

l. The ingress and egress routes.

m. Additional resources needed (paramedic, fire department, outside agencies, etc.).

B.    Planned Event Involving Potentially Large Crowds

1.    Upon notification, the Special Operations Division Commander or designee (Incident Commander) shall develop a written operations plan.

The Incident Commander of planned events shall be responsible for the overall coordination of the event as well as for crowd control and management.

Operations plans for large events requiring the redeployment of personnel from regular assignments shall be approved by the Deputy Chief of Field Operations.

8

2.  The following factors shall be considered and addressed in developing the operations plan for a large crowd event, including but not limited to:

a.  What type of event is to occur?

b.  Who are the organizers?  What is their past record of conduct (peaceful, violent, cooperative, etc.)?

c.  Will the general public visibly and/or physically oppose the planned event?

d.  Will the event involve the use or abuse of alcohol or other substances?

e.  Where is the event to occur?  Consider the size, location, and ingress and egress points.

f.  What is the optimal site for a command post as well as staging areas?

g.  Have the appropriate permits been issued?

h.  Have other agencies, bureaus, and divisions been notified and included in the planning process (paramedics, fire department, Communications, Intel, etc.)?

i.  Will the EOC be needed?  Is Mutual Aid needed?

j.  Will off-duty personnel be involved?  Has the commander of any off-duty personnel been made part of the planning process?

k.  Is it possible and appropriate to coordinate with group organizers and explain the Department's mission, preparation, and potential responses?

    Information considered sensitive or confidential shall not be released to group organizers if it will jeopardize the safety or effectiveness of police personnel.

l.  Have the proper number of personnel been scheduled to safely handle the event?  Should a reserve force be available?

m.  Has an enforcement policy been formulated and communicated to affected personnel?

3.  The Incident Commander shall ensure that the following tasks are performed:

9

    a.  Gather and analyze intelligence information about future crowd events, including review of information from both internal and external sources.

    b.  Coordinate with Special Events regarding permits and various Department sections, including bureaus, divisions, and specialized units, to prepare for a planned special event.

    c.  Meet in advance with event sponsors and group leaders to exchange information and to present the Department's philosophy and intent. Details of the department plan and preparation shall not be disclosed except when necessary to ensure success of the operation.

    d.  Coordinate with affected bureaus, divisions, police service areas, and special units to prepare and coordinate the development of an operations plan for a given event that details assignments, traffic and crowd flow, communications, tactics, and training.

    e.  Prepare operations plan as requested.

    f.  Coordinate inspection of protest/event area prior to an event to locate any pre-positioned equipment staged by demonstrators.

    g.  Ensure that appropriate equipment and supplies are available.

    h.  Ensure that a video team(s) is established and required video equipment is available (see Section IX).

    i.  Establish protocols and procedures for the processing of arrestees and collection of evidence.

4.    Personnel creating an operations plan to address a large crowd event should anticipate a variety of scenarios and devise a police response for each. Such scenarios and responses should be made part of the final plan and communicated to the affected personnel.

5.    When practical, personnel preparing for a large event with the potential for violence shall be retrained; training to include physically practicing various aspects of crowd management and crowd control.

Topics may include but are not limited to Mobile Field Force (MFF), multiple simultaneous arrest procedures, functioning in a tear gas environment, use of specialty impact munitions, applicable ordinances and statutes, protected speech, etc.

6.    Personnel shall be briefed on the operations plan and their particular assignments before deployment.

Specific instructions covering topics such as applicable laws, community concerns, appropriate enforcement actions, chain of command, tactics, traffic patterns, etc., shall be clearly presented to personnel. All personnel shall be given a copy of the operations plan.

V.    Permissible Crowd Control and Crowd Dispersal Techniques

A.    In the event of a declared unlawful assembly, it is the general policy of the OPD to use multiple simultaneous arrests to deal with a non-violent demonstration that fails to disperse and voluntarily submits to arrest as a form of political protest rather than dispersing the demonstrators by using weapons or force beyond that necessary to make the arrests.

B.    The Incident Commander shall make the final decision as to what control action, if any, will be taken to address a given crowd situation.

Crowd size and available Department resources will also factor into the police response. The following factors will be considered prior to determining what action to take:

1.    Will police action likely improve the situation?

2.    Will targeting specific violent or disruptive individuals for arrest be more effective or appropriate than applying control tactics to the entire crowd?

3.    Are sufficient resources available to effectively manage the incident?

4.    Have clear and secure escape routes been established for both the crowd and the police?

5.    Has the dispersal order been given (loudspeaker, personal contact, etc.)?

6.    Have contingency plans been established in the event initial police efforts are ineffective?

C.    Commanders shall constantly reassess and adjust tactics, as necessary, as the crowd's actions change.

D.    The Incident Commander shall consider and take reasonable and appropriate steps to ensure the safety of bystanders.

E.    When officers take action to move or disperse a crowd, steps should be taken to ensure that the crowd is not moved into a position or place that could be

11

dangerous to persons in the crowd or bystanders, such as pushing them up against glass windows.

F.    When an Unlawful Assembly May Be Declared

    1.    The definition of an unlawful assembly has been set forth in Penal Code Section 407 and interpreted by court decisions. The terms, "boisterous" and "tumultuous," as written in Penal Code Section 407, have been interpreted as "conduct that poses a clear and present danger of imminent violence" or when the demonstration or crowd event is for the purpose of committing a criminal act.

       The police may not disperse a demonstration or crowd event before demonstrators have acted illegally or before the demonstrators pose a clear and present danger of imminent violence.

    2.    The mere failure to obtain a permit, such as a parade permit or sound permit, is not a sufficient basis to declare an unlawful assembly. There must be criminal activity or a clear and present danger of imminent violence.

    3.    The fact that some of the demonstrators or organizing groups have engaged in violent or unlawful acts on prior occasions or demonstrations is not grounds for declaring an assembly unlawful.

    4.    Unless emergency or dangerous circumstances prevent negotiation, crowd dispersal techniques shall not be initiated until after attempts have been made through contacts with the police liaisons and demonstration or crowd event leaders to negotiate a resolution of the situation so that the unlawful activity will cease and the First Amendment activity can continue.

    5.    If after a crowd disperses pursuant to a declaration of unlawful assembly and subsequently participants assemble at a different geographic location where the participants are engaged in non-violent and lawful First Amendment activity, such an assembly cannot be dispersed unless it has been determined that it is an unlawful assembly and the required official declaration has been adequately given.

G.    Declaration of Unlawful Assembly

    1.    When the only violation present is unlawful assembly, the crowd should be given an opportunity to disperse rather than face arrest.

       Crowd dispersal techniques shall not be initiated until OPD has made repeated announcements to the crowd, asking members of the crowd to

voluntarily disperse and informing them that, if they do not disperse, they will be subject to arrest.

These announcements must be made using adequate sound amplification equipment in a manner that will ensure that they are audible over a sufficient area. Announcements must be made from different locations when the demonstration is large and noisy. The dispersal orders should be repeated after commencement of the dispersal operation so that persons not present at the original broadcast will understand that they must leave the area. The announcements shall also specify adequate egress or escape routes. Whenever possible, a minimum of two escape/egress routes shall be identified and announced.

It is the responsibility of the on-scene OPD commanders to ensure that all such announcements are made in such a way that they are clearly audible to the crowd.

2. Unless an immediate risk to public safety exists or significant property damage is occurring, sufficient time will be allowed for a crowd to comply with police commands before action is taken.

3. Dispersal orders should be given in English and in other languages that are appropriate for the audience.

4. The Incident Commander should ensure that the name of the individual making the dispersal order and the date/time each order was given is recorded.

5. Dispersal orders should not be given until officers are in position to support/direct crowd movement.

6. Personnel shall use the following Departmental dispersal order:

I am (rank/name), a peace officer for the City of Oakland.  I hereby declare this to be an unlawful assembly, and in the name of the people of the State of California, command all those assembled at _____ to immediately leave.  If you do not do so, you may be arrested or subject to other police action, including the use of force which may result in serious injury. Section 409 of the Penal Code prohibits remaining present at an unlawful assembly. If you remain in the area just described, regardless of your purpose, you will be in violation of Section 409.  The following routes of dispersal are available (routes).  You have _____ minutes to leave. If you refuse to move, you will be arrested.

*If you refuse to move, chemical agents will be used. (Provide the chemical warning only if use is anticipated)

7.    When a command decision is made to employ crowd dispersal techniques, attempts to obtain voluntary compliance through announcements and attempts to obtain cooperation through negotiation shall both be continued. At any point at which a crowd is dispersing, whether as a reaction to police dispersal techniques, through voluntary compliance, or as a result of discussion or negotiation with crowd leaders, OPD dispersal techniques shall be suspended and the crowd shall be allowed to disperse voluntarily. This directive does not preclude a command decision by OPD to reinstate dispersal techniques if crowd compliance ceases.

H.    Approved Tactics and Weapons to Disperse or Control a Non–Compliant Crowd

If negotiation and verbal announcements to disperse do not result in voluntary movement of the crowd, officers may employ additional crowd dispersal tactics, but only after orders from the Incident Commander or designated supervisory officials.

The use of these crowd dispersal tactics shall be consistent with the department policy of using the minimal police intervention needed to address a crowd management or control issue.

The permissible tactics to disperse or control a non-compliant crowd include all of the following (not in any specific order of use):

1.    Display of Police Officers (forceful presence)

Once this tactic is selected, officers should be assembled in formation at a location outside the view of the crowd. The formation may be moved as a unit to an area within the crowd's view. This tactic should not be used unless there are sufficient personnel to follow through with dispersal. Do not bluff a crowd. If a display of police officers, motorcycles, police vehicles, and mobile field forces, combined with a dispersal order, is not effective, more forceful actions may be employed.

Generally, officers should be assigned to squads of sufficient size to be effective. At larger events, the crowd can be divided (with a commander in charge of each squad).

2.    Encirclement and Arrest

If the crowd has failed to disperse after the required announcements, officers may encircle the crowd or a portion of the crowd for purposes of making multiple simultaneous arrests (see Section VII).

14

Persons who make it clear (e.g., by sitting down, locking arms) that they seek to be arrested shall be arrested and not subjected to other dispersal techniques, such as the use of batons or chemical agents.

Arrests of non-violent persons shall be accomplished by verbal commands and persuasion, handcuffing, lifting, carrying, the use of dollies and/or stretchers, and/or the use of control holds including the bent-wrist control hold and twist-lock control hold (See Training Bulletin "Weaponless Defense III-I.1 at pages 28-31.).

Control holds should only be used when a Supervisor or commander determines that control holds are necessary to accomplish the policing goal after other methods of arrest have failed or are not feasible under the circumstances and when the use of control holds would be a lawful use of force.

In the event control holds are necessary, precautions should be taken to assure that arrestees are not injured or subjected to unnecessary or excessive pain.  (T.B. III-1)

A decision to authorize control holds and the reasons for said decision shall be documented.

3.      Police Formations and Use of Batons

    a.  If a crowd refuses to disperse after the required announcements, the police may use squad or platoon formations (skirmish line, wedge, echelons, etc.) to move the crowd along.

    b.  Batons shall not be used for crowd control, crowd containment, or crowd dispersal except as specified below.

    c.  Batons may be visibly displayed and held in a ready position during squad or platoon formations.

    When reasonably necessary for protection of the officers or to disperse individuals in the crowd pursuant to the procedures of this policy, batons may be used in a pushing or jabbing motion. Baton jabs should not be used indiscriminately against a crowd or group of persons but only against individuals who are physically aggressive or actively resisting arrest.  Baton jabs should not be used in a crowd control situation against an individual who is physically unable to disperse or move because of the press of the crowd or some other fixed obstacle.

    d.  Batons shall only be used as set forth in General Order K-3 and Department Training Bulletin III (H.2).

15

Officers shall not intentionally strike a person with any baton to the head, neck, throat, kidneys, spine, or groin or jab with force to the left armpit except when the person's conduct is creating an imminent threat of serious bodily injury or death to an officer or any other person. Batons shall not be used against a person who is handcuffed.

4. Non Hand–Held Crowd Control Chemical Agents

   a. Crowd control chemical agents are those chemical agents designed and intended to move or stop large numbers of individuals in a crowd situation and administered in the form of a delivery system which emits the chemical agent diffusely without targeting a specific individual or individuals.

   b. Chemical agents can produce serious injuries or even death. The elderly person or infant in the crowd or the individual with asthma or other breathing disorder may have a fatal reaction to chemical agents even when those chemical agents are used in accordance with the manufacturer's recommendations and the Department's training. Thus, chemical agents shall be used only if other techniques, such as encirclement and multiple simultaneous arrest or police formations, have failed or will not accomplish the policing goal as determined by the Incident Commander.

   c. Members shall use the minimum amount of chemical agent necessary to obtain compliance.

   d. Indirect delivery or crowd dispersal spray and/or discharge of a chemical agent shall not be used in demonstrations or other crowd events without the approval of a supervisor or command officer.

   e. Chemical agents shall not be used for crowd control or dispersal without first giving audible warning of their imminent use and giving reasonable time to the crowd, media, and observers to disperse.

   f. If chemical agents are contemplated in crowd situations, OPD shall have medical personnel on site prior to their use and shall make provision for decontamination and medical screening to those persons affected by the chemical agent(s).

5. Hand-thrown chemical agents or pyrotechnic gas dispersal devices

   a. Hand-thrown chemical agents or pyrotechnic gas dispersal devices shall not be used for crowd control or crowd dispersal without the approval of a supervisor or command officer.

16

b. The use of hand-thrown chemical agents or pyrotechnic gas dispersal devices may present a risk of permanent loss of hearing or serious bodily injury from shrapnel. Said devices shall be deployed to explode at a safe distance from the crowd to minimize the risk of personal injury and to move the crowd in the direction that will accomplish the policing objective

c. Hand-thrown chemical agents or pyrotechnic gas dispersal devices shall not be used for crowd control without first giving audible warnings to the crowd and additional reasonable time to disperse.

d. Hand-thrown chemical agents or pyrotechnic gas dispersal devices shall be used only if other techniques such as encirclement and mass arrest or police formations have failed or will not accomplish the policing goal as determined by the Incident Commander.

VI. Weapons Prohibited for Crowd Control and Crowd Dispersal Purposes

A. Lethal Force

The use of lethal force by OPD members is governed by the Department's Use of Force Policy. Nothing about a crowd control situation eliminates or changes any of the constraints and criteria governing the use of lethal force in the Department's Use of Force Policy.

B. Canines

Canines shall not be used for crowd control, crowd containment, or crowd dispersal.

C. Horses

Horses shall be used only for purposes of crowd control in the event of a riot involving substantial numbers of people actively engaged in violence or serious property destruction. Horses shall never be used to disperse non-violent crowds, including persons who are seated or lying down.

Horses may be used for crowd management during festivals and sporting events.

D. Fire Hoses

Fire hoses shall not be used for crowd control, crowd containment, or crowd dispersal.

E. Motorcycles

17

The technique referred to as the Basic Use of Motorcycle Push Technique (B.U.M.P.) outlined in Special Order No. 7088 is prohibited (See Special Order No. 8135 prohibiting said technique enacted April 5 2004.). Motorcycles and police vehicles may not be used for crowd dispersal but may be used for purposes of observation, visible deterrence, traffic control, transportation, and area control during a crowd event.

F.    Specialty Impact Less–Lethal Weapons

    1.    Skip Fired Specialty Impact Munitions (Wooden Dowels and Stinger Grenades) are prohibited.

        a.    Any and all less–lethal specialty impact weapons designed to be skip fired or otherwise deployed in a non-directional non-target specific manner, including but not limited to the Multiple Wood Baton Shell (264W) manufactured by Armor Holdings, Inc. shall not be used at all by OPD during demonstrations or crowd events (See Special Order No. 8135 prohibiting indirect fired less–lethal munitions and withdrawing said ammunition, enacted April 5, 2004.).

        b.    The use of the Stinger Grenade containing rubber pellets designed to be deployed in a non-directional non-target specific manner is also prohibited for all crowd control use.

    2.    Uses of Direct Fired Specialty Impact Munitions (SIM).

        Direct Fired SIM are less–lethal specialty impact munitions that are designed to be direct fired at a specific target including but not limited to flexible batons ("bean bags"), shall not be used for crowd management, crowd control or crowd dispersal during demonstrations or crowd events. Direct Fired SIM may never be used indiscriminately against a crowd or group of persons even if some members of the crowd or group are violent or disruptive.

        a.    Direct Fired SIM against a specific individual who is engaging in conduct that poses an immediate threat of serious bodily injury to himself or herself, officers, or the general public or who is engaging in substantial destruction of property which creates an imminent risk to the lives or safety of other persons. In such instances, Direct Fired SIM shall be used only when other means of arrest are unsafe and when the individual can be targeted without endangering other crowd members or bystanders (See Special Order No. 8135 enacted April 15, 2004.).

b.   The use of Direct Fired SIM must cease when the violent or destructive actions cease. These weapons must not be used for the purpose of apprehension or to otherwise prevent escape unless escape would present a substantial risk of continued imminent threat to loss of life or serious bodily injury.

c.   Members shall only deploy Direct Fired SIM during a demonstration or crowd event under the direction of a supervisor.

d.   When circumstances permit, the supervisor on the scene shall make an attempt to accomplish the policing goal without the use of Direct Fired SIM as described above, and, if practical, an audible warning shall be given to the subject before deployment of the weapon.

e.   Any person struck by a round shall be transported to a hospital for observation and any necessary treatment. Ambulance service, if required, shall be ordered per General Order I-4. First aid, when necessary, shall be administered per Training Bulletin III-K.

f.   No member shall use Direct Fired SIM without formal training.

g.   Direct Fired SIM shall not be used against a person who is under restraint.

h.   Members shall not discharge a Direct Fired SIM at a person's head, neck, throat, face, left armpit, spine, kidneys, or groin unless deadly force would be justified.

G.   Electronic Immobilizing Devices (EID's)

EID's such as tasers, stun guns and stun shields shall not be used for crowd management, crowd control, or crowd dispersal during demonstrations or crowd events.

H.   Aerosol Hand–held Chemical Agents (TB V-F2)

Aerosol, hand–held, pressurized, containerized chemical agents that emit a stream shall not be used for crowd management, crowd control, or crowd dispersal during demonstrations or crowd events. Aerosol hand held chemical agents may not be used indiscriminately against a crowd or group of persons, but only against specific individuals who are engaged in specific acts of serious unlawful conduct or who are actively resisting arrest.

Members shall use the minimum amount of the chemical agent necessary to overcome the subject's resistance.

19

Officers must be familiar with OPD Training Bulletin V-F2 and, specifically, the risk factors associated with aerosol chemical agents and the treatment for individuals subjected to them.

Aerosol chemical agents shall not be used in a demonstration or crowd situation or other civil disorders without the approval of a supervisor or command officer.

When possible, persons should be removed quickly from any area where hand–held chemical agents have been used. Members shall monitor the subject and pay particular attention to the subject's ability to breathe following the application of OC. As soon as practical, members and employees shall obtain professional medical treatment for all persons who have had OC applied to them. Paramedics in the field may administer treatment if no other medical treatment is required. If paramedics are not available in a timely manner, subjects shall be transported to a hospital for treatment within 45 minutes of the application of OC.

A subject who has been sprayed with hand–held chemical agents shall not be left lying on his/her stomach once handcuffed or restrained with any other device.

VII.    Arrests

A.    Multiple Simultaneous Arrests

1.    When a large-scale event involving possible arrests is to be conducted, OPD planners will estimate the number of potential arrestees and will configure arrest teams capable of managing multiple arrests safely.

2.    When arrests are necessary, the Incident Commander shall attempt to ensure that sufficient numbers of police officers are present to effect arrests. This tactic can be effective in dispersing the remaining crowd members wanting to avoid arrest.

3.    When multiple arrests are contemplated in advance and it is impractical for arrestees to be cited at the scene as further discussed below, pre-arrangement of transportation shall be made.

4.    The Incident Commander shall make the decisions to engage in selective individual arrests or multiple simultaneous arrests as a crowd control technique with consideration given to the following factors:

- The likelihood that police action will improve the situation relative to taking no action.
- The seriousness of the offense(s) as opposed to the potential for the arrest to escalate violence or unlawful activity by crowd members.

- Whether individual or mass arrests will be more effective in ending the criminal activity at issue.
- Whether clear and secure escape routes have been established for the crowd and police.
- Whether communication has been established with crowd representatives.
- What contingency plans are available.
- What types of force can be used in effecting the arrests, if necessary.

5.   Probable Cause for each individual arrest:

Individuals may not be arrested based on their association with a crowd in which unlawful activity has occurred. There must be probable cause for each individual arrest.

This principle means the officer must have objective facts based on his own knowledge or information given him by other officers sufficient to believe that each specific individual being arrested committed the offense. Thus, the only proper basis for a multiple simultaneous arrest of all the individuals encircled at a demonstration is failure to disperse (Pen. Code §409), when the dispersal was properly ordered based on the existence of an unlawful assembly and adequate notice and opportunity to disperse has been given.

To make arrests for violating Vehicle Code §2800 (noncompliance with lawful police order), the officer must have probable cause to believe that each individual arrested willfully failed or refused to comply with a lawful order.

6.   The Incident Commander shall ensure that evidentiary items are recovered and preserved, when possible, to corroborate unlawful acts observed by personnel.

B.   Arrests for Civil Disobedience

1.   Some demonstrators commit "civil disobedience," by sitting down or otherwise blocking streets, intersections, sidewalks, and/or entranceways or by occupying a targeted office.

The proper response to such actions is to verbally advise the demonstrators that they will be subject to arrest if they choose to remain, allow time for some or all the demonstrators to cease the unlawful activity, and to arrest those who deliberately remain in violation of the law.

21

When practical, demonstrators in civil disobedience situations shall be persuaded into compliance rather than being forcibly removed.

2.   Passively resisting arrestees (i.e., arrestees who go limp) shall be arrested by handcuffing and then either by verbal persuasion, lifting, carrying, the use of dollies or stretchers, and/or control holds (See Training Bulletin "Weaponless Defense" III-I.1 at pages 28 – 31), depending on the circumstances and the decision of the Supervisor.

Control holds should be used only when the Supervisor determines that control holds are necessary to accomplish the policing goal after other methods of arrest have failed or are not feasible under the circumstances and when the use of control holds would be a lawful use of force.

In the event control holds are necessary, precautions must be taken to ensure that arrestees are not injured or subjected to unnecessary or excessive pain.

A Supervisor's decision to authorize control holds and the reasons for said decision should be documented.

Planning for demonstrations where civil disobedience and passive resistance to arrest are a possibility should take into account these different arrest techniques for passive demonstrators.

3.   In some cases, demonstrators may lock arms or use lock boxes to slow down the arrest process.

Where such demonstrators have been advised that they will be subject to arrest if they choose to remain and refuse to disperse, a member of the arrest team shall individually advise each demonstrator that he or she is under arrest prior to the application of any force to remove locking devices or to move the demonstrators. The officer shall continue to give verbal directions to give the arrestee a chance to comply before force is used to unlock arms or implements used to remove lock boxes.

4.   Although dealing with passive resistance may frustrate officers, civil disobedience is usually a nonviolent means of making a political statement, and officers shall remain neutral, non-antagonistic, and professional at all times in their response.

C.   Use of Handcuffs

1.   All persons subject to arrest during a demonstration or crowd event shall be handcuffed in accordance with department policy, orders, and Training Bulletins.

22

2.   Officers should be cognizant that flex-cuffs may tighten when arrestees' hands swell or move, sometimes simply in response to pain from the cuffs themselves.

Each unit involved in detention and/or transportation of arrestees with flex-cuffs should have a flex-cuff cutter and adequate supplies of extra flex-cuffs readily available. The officer applying flex-cuffs shall write his serial number in indelible marker on the cuffs whenever used. When arrestees complain of pain from overly tight flex cuffs, members shall examine the cuffs to ensure proper fit

D.   Arrest of Juveniles

Juveniles arrested in demonstrations shall be handled consistent with OPD policy on arrest, transportation, and detention of juveniles.

VIII.   Cite/Release and Booking Procedures

A.   Individuals arrested for minor offenses may be cited and released in compliance with Penal Code § 853.6 and Departmental General Order M-7, Citations for Adult Misdemeanors, III, A-N. .

B.   When it is impractical to cite arrestees at or near the site of the demonstration because of a substantial risk that this procedure would allow the unlawful activity to continue or because of specific geographic factors, individuals may be held at police stations or jails for the duration of the cite and release process.

C.   An officer seeking to book a misdemeanor arrestee into jail must have an articulable basis to believe that one of the specified statutory exceptions to mandatory cite and release applies to that individual.  This basis must be documented in the police report.

D.   The mere fact that further demonstrations are likely to be held in the near future is not a proper basis to apply subdivision (7) of P.C. 853.6 ("reasonable likelihood that the offense may continue or resume") to individual demonstrators.

E.   There must be an articulable objective basis to believe that, if cited out, those specific individuals would continue the same illegal activity for which they were arrested.

F.   Individuals may not be booked into jail on the sole basis of a felony charge consisting of conspiracy to commit a misdemeanor.

IX.   Documentation

A.   Video and Photographic Recording

23

1.  It is the policy of the Department to videotape and photograph in a manner that minimizes interference with people lawfully participating in First Amendment activities.

    Videotaping and photographing of First Amendment activities shall take place only when authorized by the Incident Commander or other supervisory officer.

2.  Individuals should not be singled out for photographing or recording simply because they appear to be leaders, organizers, or speakers.

3.  Each camcorder operator shall write a supplemental report at the end of his/her duty assignment documenting the camcorder operations.

4.  Unless they provide evidence of criminal activity, videos or photographs of demonstrations shall not be disseminated to other government agencies, including federal, state, and local law enforcement agencies.  If videos or photographs are disseminated or shared with another law enforcement agency, a record should be created and maintained noting the date and recipient of the information.

5.  If there are no pending criminal prosecutions arising from the demonstration or if the video recording or photographing is not relevant to an Internal Affairs or citizen complaint investigation or proceedings or to civil litigation arising from police conduct at the demonstration, the video recording and/or photographs shall be destroyed in accordance with Department and city policies.

    This directive shall not prohibit the OPD from using these videos or footage from such videos as part of training materials for OPD officers in crowd control and crowd dispersal techniques and procedures. The destruction of any such videos or photographs shall be documented in writing with regard to the date of the destruction and the identity of the person who carried it out.

6.  Nothing in this section is intended to alter the disclosure requirements of the California Public Records Act (Government Code §6250 et seq.) or the City of Oakland's Sunshine Ordinance (O.M.C. §2.20 et seq.).

X.     Reporting

A.   The Incident Commander shall ensure that the Deputy Chief of the Bureau of Field Operations is notified of the incident in a timely manner.

B.   OPD officers involved in demonstrations or crowd events shall prepare reports as required by Department policy.

XI.   Public Information and the Media

    A.    The media have a right to cover demonstrations, including the right to record the event on video, film, or in photographs.

    B.    OPD members shall accommodate the media in accordance with Department policy.

    C.    The media shall be permitted to observe and shall be permitted close enough access to the arrestees to record their names. Even after a dispersal order has been given, clearly identified media shall be permitted to carry out their professional duties in any area where arrests are being made unless their presence would unduly interfere with the enforcement action.

    D.    Self-identified legal observers and crowd monitors do not have the same legal status as the professional media and are, therefore, subject to all laws and orders similar to any other person or citizen.

            Said personnel must comply with all dispersal orders similar to any other person or citizen.  A supervisor or commander may allow a person who self-identifies as a legal observer or crowd monitor to remain in an area after a dispersal order if circumstances permit and if the person's presence would not unduly interfere with the enforcement action.

    E.    On request, the Incident Commander or a Supervisor may inform the media, legal observers, crowd monitors, police liaison, and/or organizers about the nature of any criminal charges to be filed against arrestees, the location where arrestees are being taken, and the Department's intent for arrestees to be cited out or booked at a custodial facility.

    F.    The media, legal observers, crowd monitors, police liaison, and/or organizers shall never be targeted for dispersal or enforcement action because of their status.

XII. Training

    A.    All OPD crowd control policies and procedures shall be set forth in a Crowd Control Training Bulletin.

            All other OPD orders and Training Bulletins will be reviewed to ensure consistency with the new policy and Training Bulletin.

    B.    All officers must receive training consistent with these new policies and procedures.

25

All training on crowd control shall include substantial coverage of these Department policies. No officers shall use less-lethal weapons unless they have received the training required by Department policies.

C.    Every OPD officer shall receive this training.

Either independently or in conjunction with other scheduled training, each officer shall receive periodic instruction regarding the key elements of this policy. The Department will seek to improve its ability to manage crowd control events through study and evaluation of past incidents occurring in Oakland and other jurisdictions. Training in crowd management is crucial and shall be an ongoing process. All members of OPD shall be trained in these crowd control policies and procedures and shall then receive additional periodic crowd control refresher training thereafter. Crowd control training shall also become an integral part of the recruit academy curriculum.

D.    All training called for in this section shall be documented with regard to individual officer attendance, dates of training, test scores or other evidence of successful completion of training, and identity of each instructor, and copies of both student curriculum materials and instructor curriculum materials shall be archived.