1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Declaration of Gregory M. Fox**

**EXHIBIT C** ( 22 pages from Heyman Depo)

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SRI LOUISE COLES, et al.,

           Plaintiff,

    v.

CITY OF OAKLAND, et al.,

           Defendants.

File No.

    C03-2961 TEH (JL)

**CERTIFIED COPY**

LOCAL 10, INTERNATIONAL
LONGSHORE AND WAREHOUSE
UNION, et al.,

           Plaintiffs,

    v.

CITY OF OAKLAND, et al.,

           Defendants.
                       /

File No.

    C03-2962 TEH (JL)

DEPOSITION OF:

JACK HEYMAN

VOLUME I, Pages 2 to 174

Friday, May 27, 2005

Reported by:    Suzanne A. Quan
                  C.S.R No. 5157

                  SUZANNE A. QUAN & ASSOCIATES
                 Certified Shorthand Reporters
                     1490 Acton Street
                 Berkeley, California  94702
                    (510) 528-1920

Deposition of JACK HEIM — VOL. I

1     Q.   You arrive at the east gate.

2          Did you make communication with the Oakland

3    officers?

4     A.   Yes, I did.  I first came to the west gate to

5    assess the situation of the demonstrators.  Then I went

6    over to the east gate and parked my car, I guess sort of

7    out in the street a little bit.  So I asked one of the

8    officers, "Who's in charge here?"  And he directed me to

9    Hee and Yaw.

10         MR. CHANIN:  Yeah.

11         THE WITNESS:  It's Yee and Haw, H-A-W and

12   Y-E-E.  What did I say?

13         MR. CHANIN:  Yaw and Hee.

14         THE WITNESS:  I went up to him and identified

15   myself.  First thing they said is, "if you're the

16   business agent" -- they were very appreciative that I

17   was establishing a line of communication with them.

18         They said, "Look, the first thing is you can't

19   park your car out in the street like that.  You've got

20   to park it next to the curb.  Get it out of the way,

21   'cause there's a lot of traffic coming in and out,

22   especially emergency traffic."

23   BY MR. FOX:

24    Q.   Right.

25    A.   I explained who I was to them.

1    pretty simple questions.

2            So ordinarily, on a normal business day, a

3    longshoreman would drive down Middle Harbor and drive

4    through the east or the west gate to go to work?

5        A.    Yes.

6        Q.    On this day, did you specifically know if

7    longshoremen had entered the gates before your arrival?

8        A.    They had not entered before my arrival, 'cause

9    I was there I guess around 5:30, something like that,

10   maybe quarter to 6:00.  I don't know how long it took me

11   to get there, but the longshoremen were not there when I

12   first got there.

13       Q.    At the west gate?

14       A.    Right.

15       Q.    Or the east gate?

16       A.    Right.

17       Q.    So you talked to -- you introduced yourself to

18   the captain and the deputy chief?

19       A.    Right.

20       Q.    You've told them you were there.  Why?  Why

21   are you there?

22       A.    I told them I was the union official on duty,

23   and we talked for a few minutes.  And I explained that

24   the longshoremen were separate from the demonstrators.

25   We're not part of the demonstration, and I just wanted

Deposition of JACK HEYMAN, VOL. I

1  to make sure that we establish a clear line of

2  communication so that there's not going to be a problem

3  with the workers who I represent.  I told them they'll

4  be -- now, they were starting to come now; all right?

5      Q.    The demonstrators?

6      A.    The longshoremen are coming, they're driving

7  their cars, and some of them did get in to park their

8  cars back in here.  In the west gate, there's a facility

9  in there.  Others were already backing up their cars

10  because they couldn't get in to the parking facility and

11  that's why Yee and Haw had told me, "Park your car on

12  the side whenever you're going back and forth".  They

13  said that to me a couple times.

14      Q.    Why were the longshoremen unable to enter the

15  west gate?

16      A.    The picketers were gathering fairly rapidly.

17  They had a bus, they were transporting people by bus.

18  Every time a bus came, I don't know how many people got

19  in it, but maybe 30 people or so would get out.

20          And so, you know, there was starting to be a

21  larger demonstration, and the cars were backed up.  Some

22  longshoremen were in the parking lot.  Others were

23  parked out in the street waiting to go in.

24      Q.    Now, from what you could tell, were the

25  demonstrators marching in a circle or -- how were they

1  Captain Yee and Deputy Chief Haw, after the disbursal

2  order, did you see people walk through the police lines

3  moving eastbound?

4       A.    I don't recall that.

5       Q.    Did you go up to Captain Yee and Deputy Chief

6  Haw and say, "Can I take my union members and move east,

7  walk east to get away from this gate?"

8       A.    No.

9       Q.    Did you go up to Deputy Chief Haw and Captain

10 Yee, before the disbursal order, and say to them, "Where

11 should I take my people so they'll be safe from any

12 police action?"

13             MR. CHANIN:   Objection.   Asked and answered.

14             MR. FOX:   Go ahead.

15             THE WITNESS:   No.

16 BY MR. FOX:

17      Q.    Any reason for that?

18      A.    They were going to do what they were going to

19 do, and it was obvious that nothing was going to deter

20 them from their plan of action.

21      Q.    After the disbursal order was given by Captain

22 Yee, did you go up to Captain Yee and Deputy Chief Haw

23 and say, "What should I do about the longshoremen that

24 were not involved in the demonstration?   Where should I

25 take them so they'll be safe?"

1      A.    It was complete chaos.   The police started

2   marching on the demonstrators and -- they opened fire

3   and there was no way to approach an officer under those

4   circumstances.

5      Q.    So now let's move to where the police now have

6   opened fire.

7            You see this thing go up in the air, big plume

8   of smoke, explosion; correct?

9      A.    Yeah.

10     Q.    That's the first explosion you hear?

11     A.    Yes.

12     Q.    When you hear that explosion, where are you on

13  Exhibit 10?

14     A.    Somewhere between the east and the west gate.

15  And there were a couple things happening simultaneously.

16           I had been walking with Howard Oliver.   We

17  both saw and heard the explosion by the police.   He

18  said, "This isn't right, this a peaceful demonstration,

19  and the police shouldn't be acting like this."   That's

20  just paraphrasing.

21     Q.    That's fine.

22     A.    And then Richard Marzano from the PMA came by

23  me, and said, "Oh, fun and games."

24           I said, "No, Richard, this is serious

25  business."

1      Q.   Right.   Now when you hear that explosion and

2 see that plume of smoke in the air, are you in front of

3 the police line or are you behind the police line?

4          MR. CHANIN:   Objection.

5          Go ahead.

6          THE WITNESS:   The police line is by the east

7 gate, and they're starting to walk towards the west

8 gate.   I'm closer to the west gate.

9 BY MR. FOX:

10      Q.   So you are in front of the police line?

11      A.   Yes.

12      Q.   And when that explosion takes place, which

13 side of Middle Harbor Road are you?

14      A.   On the APL side.

15      Q.   And you are walking westbound?

16      A.   Yes.

17      Q.   And why are you walking westbound?

18      A.   Because when the announcement was given, some

19 of the people started moving kind of drifting towards

20 SSA.   Everybody was moving away from the police.

21      Q.   Okay.   And as they moved away from the police

22 and as you moved away from the police, did you tell your

23 members at that point in time, "Move west, walk west"?

24      A.   I don't think you have a clear picture of the

25 scene.

1    Q.   Okay.  Did he tell you who was shot?

2    A.   I don't recall.

3    Q.   Did you subsequently find out it was Billy

4  Kepo'o?

5    A.   Yes.  And Ernie Evans.

6    Q.   Are you with Kepo'o and Evans when they're

7  shot?

8    A.   No.

9    Q.   Do you know where you are when they are shot?

10       MR. CHANIN:  Objection.  He hasn't --

11  objection.  Misstates facts.  Specifically, that --

12       MR. FOX:  I asked him where he was, if he knew

13  where he was when they were shot.

14       MR. CHANIN:  Lacks foundation that -- go

15  ahead.

16       MR. FOX:  Go ahead.

17       THE WITNESS:  I don't know when they were

18  shot.  I know when I got my phone call.  I wasn't there.

19  I didn't witness them being shot.

20       MR. CHANIN:  Thank you.

21  BY MR. FOX:

22    Q.   So you get a phone call saying that they've

23  been shot.

24    A.   Yes.

25    Q.   What do you do?

1        A.    I get in my car.

2        Q.    Right.

3        A.    And headed over to where Lyman said they were

4    shot.   One was lying in the street.   The other was on

5    the curb holding his hand.

6        Q.    That was in the vicinity of the east SSA gate?

7        A.    Yes.

8        Q.    Correct?

9        A.    Yes.

10       Q.    You get in your car and you drive to that

11   vicinity; correct?

12       A.    Yes.

13       Q.    Now, as you get in your car and you drive to

14   the east SSA gate, where is this police formation that

15   had originated somewhere around the west APL gate?

16       A.    The police formation is over by this

17   intersection of Maritime and Middle Harbor.

18       Q.    So the police formation has now moved to the

19   west SSA gate; correct?

20       A.    Uh-huh.

21       Q.    Yes?

22             MR. CHANIN:   Jack, you have to answer "yes" or

23   "no".

24             THE WITNESS:   Yes.

25             This is a different police formation.   There's

1   Ernie Evans had his back turned to the police.  He got

2   shot in the back, and he in no way looks like a

3   demonstrator, if you know Ernie.

4       Q.    Did they tell you that the police had fired on

5   demonstrators before they fired on the longshoremen?

6       A.    Well, what I recall them saying is that the

7   police were firing indiscriminately at everybody, which

8   is what I had tried to prevent by talking to Yee and

9   Haw.

10      Q.    You're now attending to these people,

11   Mr. Kepo'o and Mr. Evans, other individuals there.

12       What happens next that then moves you from

13   that location?

14      A.    Henry Graham, the president of the local, said

15   that there are people down, steady men at the other SSA

16   gate, which you have not marked on this map.

17      Q.    So show me on Exhibit 10 the other gate.

18      A.    The other gate is all the way down heading

19   west on the Middle Harbor Road.

20      Q.    Okay.

21      A.    With the property contiguous with Hanjin.

22      Q.    Why don't you put a "1" and a circle there,

23   and that's going to be the SSA gate further west on

24   Middle Harbor from the gates that we have marked as east

25   and west; correct?

```
 1        A.    Yes.

 2        Q.    Does Henry tell you this in person or over the

 3   phone?

 4        A.    In person.  As I said before, he and Trent

 5   Willis had been able to walk through the police barriers

 6   and come down into the Middle Harbor Road area.

 7        Q.    All right.  Did they then walk over to where

 8   you were tending to Mr. Kepo'o?

 9        A.    Absolutely, because our first job is to

10   protect our members.  As soon as I got the phone call

11   from Lyman Hollins, I reported to Henry Graham and we

12   went as quickly as possible over to this area.

13        Q.    So Mr. Graham is physically present with you

14   at the east SSA gate; correct?

15        A.    Yeah.

16        Q.    He's standing there?

17        A.    Yes.

18        Q.    He then tells you we have people that need

19   assistance down by -- on Exhibit 10, the gate marked

20   "1"?

21        A.    No.

22        Q.    What does he tell you?

23        A.    He said, "We have members down at Gate 1.

24   You've got to give them a warning of what's happening

25   down here.  They don't know that our men have been shot
```

1    down there."

2         Q.    All right.

3         A.    Something to that effect.

4         Q.    When he tells you to warn them, do you attempt

5    to reach them by cell phone?

6         A.    I don't know any of the cell phone numbers of

7    people down there.

8         Q.    What do you then decide to do in order to

9    reach your people to advise them of what has happened?

10        A.    I attempted to do what I had been doing all

11   morning, which is get in my car, which was clearly

12   designated ILWU business agent.  I had a placard in the

13   front and a placard in the back.  And all morning, I'd

14   been going mainly between the east and west gate, and in

15   this particular situation, I got in my car and drove

16   slowly up to -- and I realize there was a police

17   formation over here.

18        Q.    All right.

19        A.    What I was attempting to do, driving slowly,

20   was to get to these members over here at what we're

21   calling Gate 1.

22        Q.    I'm going to stop you there and ask you a

23   couple of questions.

24             Prior to your driving west on Middle Harbor at

25   this point in time to reach the gate marked "1", had you

1    driven your car -- up until that point in time, had you

2    driven your car through any police formations, either

3    eastbound or westbound?

4         A.    The police had a formation over here by the

5    east gate.   There also had been police wandering around

6    the whole APL area and up by where the demonstrators

7    were.

8              So yes.   The answer is yes, I'd driven around

9    where police were all morning.

10        Q.    Now, when Captain Yee and Deputy Haw told you

11   to park your car -- remember that?

12        A.    Yes.

13        Q.    And you parked your car.   After you parked

14   your car, had you gotten back into your car after that

15   to drive east?

16        A.    Yes.

17             MR. CHANIN:   And that misstates his testimony

18   about what he said about parking his car.   They said

19   where to park his car, not that he should park his car.

20   The record will reflect that.

21             MR. FOX:   All right.

22   BY MR. FOX:

23        Q.    After you've been told by the police to park

24   your car --

25             MR. CHANIN:   Objection.

```
 1              THE WITNESS:   Where to park your car.

 2   BY MR. FOX:

 3        Q.     After the police had told you where to park

 4   your car, had you gotten back into your car and had you

 5   driven then back east while the officers were standing

 6   out on Middle Harbor carrying their rifles and wearing

 7   their helmets?

 8        A.     Yes.

 9        Q.     Had the police moved so you could drive

10   through them?

11        A.     Yes.

12        Q.     Okay.   And was this before Captain Yee gave

13   the disbursal order?

14        A.     Yes.

15        Q.     After Captain Yee gave the disbursal order,

16   did you once again get in your car and drive through a

17   police formation before what happens at the west SSA

18   gate?

19        A.     No.

20        Q.     You get back in your car, and you're now going

21   to drive west in order to reach Gate No. 1; correct?

22        A.     Yes.

23        Q.     And when you begin to drive west, are there

24   other cars driving west as well?

25        A.     There were other cars between the west gate of
```

1    APL and the east gate of SSA.

2         Q.    Were they parked or were they driving?

3         A.    They were in their cars.  Some drivers were

4    just standing up by their cars.  It was a mixed thing.

5    I kind of went around them.

6         Q.    So you then begin driving west.

7               Were you in the westbound lane?

8         A.    Very slowly, because there were a lot of

9    pedestrians.  There were, you know, people all over the

10   place.

11        Q.    All right.  You're driving west in the

12   westbound lanes, and you are now beginning to approach

13   the west SSA gate; correct?

14        A.    Yes.

15        Q.    All right.  You're driving, and as you look

16   up, what do you see on Middle Harbor Road as you're

17   approaching the west SSA gate?

18        A.    There was a phalanx of police.  I believe they

19   were on motorcycle, but there was a phalanx of police

20   there.

21        Q.    There's a line, a rough line of officers on

22   motorcycles; correct?

23        A.    I believe that's correct.

24        Q.    Were they stretched across Middle Harbor Road?

25        A.    To the best of my recall, yes,

1    Q.   Were the officers moving in a line on their

2 motorcycles or the motorcycles stopped?

3    A.   I believe they were moving very slowly at that

4 point.

5    Q.   Either in front of the motorcycles or behind

6 the motorcycles, was there a line of officers on foot?

7    A.   I don't recall.

8    Q.   Now this is going to be very important in

9 terms of what you remember.

10    Either -- behind the motorcycles, were there

11 any police vehicles moving westbound very slowly?

12    A.   You mean, cars?

13    Q.   Cars, SUVs, trucks, vans.

14    A.   The only police vehicles that I noticed were

15 the motorcycles.

16    Q.   So you don't recall police vehicles moving

17 west behind the motorcycles?

18    A.   I don't recall that.

19    Q.   All right.  As you become aware of these

20 police motorcycles moving slowly westbound, what next do

21 you do regarding your vehicle?

22    A.   The police line was moving in this direction

23 on up Maritime, and so I was hoping to crawl along with

24 my vehicle.  And once this intersection was cleared,

25 either to go up Middle Harbor Road, or if it was

```
 1    possible, to go to Maritime and then around to Gate

 2    No. 1 to inform my members of the danger.

 3         Q.    So as you approached the west gate of SSA, was

 4    the intersection there clear?

 5         A.    No, not at that point.

 6         Q.    What was preventing it from being clear?

 7         A.    Well, the police line that was moving slowly

 8    up Maritime.

 9         Q.    So the police line --

10         A.    Towards Maritime.

11         Q.    So the police line was blocking your access

12    through the intersection?

13         A.    Yes.

14         Q.    What do you then do?

15         A.    Well, as I said, I was just sort of crawling

16    slowly, and then a woman police officer yelled out to me

17    to stop my car.

18         Q.    While you're driving slowly, are you talking

19    on your cell phone?

20         A.    I don't recall that.  I could have been, but I

21    don't recall.

22         Q.    All right.  While you're driving slowly, the

23    female police officer, is she on foot?

24         A.    Yes.

25         Q.    And how far from you is she located when you
```

```
 1   BY MR. FOX:

 2        Q.   Okay.  What does she do that gets you to focus

 3   your attention on her?

 4             MR. CHANIN:  Asked and answered.

 5             THE WITNESS:  She said, "Stop your car."

 6   BY MR. FOX:

 7        Q.   What do you do in response?

 8        A.   I stop the car to talk to her.

 9        Q.   All right.  You stop the car.

10             Then what happens?

11        A.   I identified myself, even though the placard

12   was in the window explaining who I was.  And I said,

13   "I'm the union representative here, and I need to inform

14   my members at the other SSA gate."

15             Because you have to remember, she's at the

16   east SSA gate, and there are three SSA gates.

17        Q.   Is she at the east or at the west?

18        A.   She's over here, by the east SSA gate.

19        Q.   Okay.

20        A.   All right.  I have to get to the furthest west

21   that we marked No. 1, that No. 1 gate.  That was told to

22   me by the president of the union, to inform these

23   members that we were in danger --

24        Q.   I understand.

25        A.   -- that our members had already been shot.
```

1       Q.   Right.

2       A.   And I was attempting to fulfill my duty.

3       Q.   Now, when you communicated with her, what was

4   your tone of voice?

5       A.   I tried to be very rational and just

6   business-like, the way I'm talking to you, because I

7   knew it was a tense situation, and that things had

8   changed once the first firing happened.  They were in a

9   different mode.

10      Q.   Right.  What was her tone of voice as she

11  communicated with you?

12      A.   She was firm and business-like.

13      Q.   Okay.  You told her what your purpose was?

14      A.   Yeah.

15      Q.   What did she say, if anything, in response?

16      A.   She said, "I don't care."

17      Q.   Okay.  Did she say something else?

18      A.   I believe she said, "Park your car."

19      Q.   All right.  What did you say in response?

20      A.   I said, "Okay.  I'm going to park over here by

21  the curb."

22      Q.   Did you take your right hand and gesture with

23  it?

24      A.   No.  I just went over to park on the side.

25      Q.   All right.  So she said to you --

                                                              134

SUZANNE A. QUAN, CSR    (510) 528-1920

1      A.   And she didn't say anything.  I drove over to

2  park on the side.  She didn't respond to me.

3      Q.   Just so I'm clear, she says "Park your car."

4           Do you say something in response to her

5  statement of "Park your car"?

6      A.   I just said okay.

7      Q.   All right.  You said okay.

8           What did you then do?

9      A.   I proceeded to park the car.

10     Q.   And how did you do that physically?

11     A.   I drove from the right-hand lane -- it's a

12  very wide boulevard, if you've seen it.

13     Q.   Right.

14     A.   And I drove over to the curb and parked next

15  to the curb, which is exactly what Yee and Haw had been

16  telling me to do.  That's what I did.

17     Q.   So what lane are you in when she tells you to

18  park the car?

19     A.   I'm in the right-hand lane.

20     Q.   So you are -- there's two westbound lanes?

21     A.   Yes.  And there's a side lane and I think

22  there's a solid line there.  That's where I moved to

23  park.

24     Q.   Okay.  The two westbound lanes on Middle

25  Harbor, I'm going to call the lane closest to the center

135

1      Q.    And --

2            MR. CHANIN:  Could we just go off the record.

3            (Discussion off the record.)

4   BY MR. FOX:

5      Q.    Mr. Heyman, while you were being physically

6   arrested and I mean by that being taken out of your

7   vehicle --

8            MR. CHANIN:  I'm sorry.  Have to take one

9   break.

10           (Break taken.)

11  BY MR. FOX:

12     Q.    All right.  During the entire time of your

13  physical arrest while you're being forcibly taken out of

14  your vehicle, physically put on the ground and

15  handcuffed, then stood up and put into the van, did any

16  of the officers say anything to you with regards to your

17  union membership?

18     A.    Not that I recall.

19     Q.    Did any of them refer to you by your name?

20     A.    I don't think so.

21     Q.    Did any of them refer to you with any kind of

22  derogatory language, epithets, obscenities or anything

23  like that?

24     A.    Not to me.  When I was arrested and put in the

25  paddy wagon or the van, June Brashares was in there and

SUZANNE A. QUAN
Certified Shorthand Reporter
1490 Acton Street
Berkeley, CA  94702
(510) 528-1920

June 10, 2005

MR. JACK HEYMAN
c/o JAMES B. CHANIN
ATTORNEY AT LAW
3050 Shattuck Avenue
Berkeley, California  94705

Re: Sri Louise Coles v. City of Oakland
Deposition taken on Friday, May 27, 2005
ORIGINAL TRANSCRIPT SEALED IN 35 DAYS

Please take notice that the Federal Rules of Civil
Procedure Section 30(e) provide the following:

> "If requested by the deponent or a
> party before completion of the
> deposition, the deponent shall have
> 30 days after being notified by the
> officer that the transcript or
> recording is available in which to
> review the transcript or recording
> and, if there are changes in form or
> substance, to sign a statement
> reciting such changes and the reasons
> given for making them."

You may make your appointment with us for reviewing the
original transcript at this office.

Very truly yours,


SUZANNE A. QUAN
CERTIFIED SHORTHAND REPORTER


cc:    Original Transcript
       All Counsel

172