1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Declaration of Gregory M. Fox**
**EXHIBIT E** ( 10 pages from Chapman Depo)

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                         ---oOo---
 4
 5   SRI LOUISE COLES, ET AL.,
 6              Plaintiffs,
 7        VS.                        No. C03-2961 TEH(JL)
                                         C03-2962 TEH(JL)
 8   CITY OF OAKLAND,
     A MUNICIPAL ENTITY, ET AL.,
 9
               Defendants.
10   _____/
11   LOCAL 10, INTERNATIONAL LONGSHORE
     AND WAREHOUSE UNION, ET AL.,
12              Plaintiffs,
13        VS.
14   CITY OF OAKLAND, ET AL.,
15              Defendants.
     _____/
16
17              DEPOSITION OF ALLEN CHAPMAN
18                    April 12, 2005
19
20   Reported by:
     ANNETTE M. SNYDER
21   CSR NO. 1880
     FOX
22
23                   LUSK & SNYDER
                760 MARKET STREET, SUITE 326
24             SAN FRANCISCO, CALIFORNIA  94102
25             (415) 362-5991/FAX (415)362-6198
```

COPY

1   A.      Now you are getting ahead. You are now
2   getting to the destination.
3           Now you want me to get to the destination?
4   Q.      I guess I do.
5   A.      Unless you want me to tell you anything else
6   that happened out here?
7           MR. NISENBAUM: Where did you park your car?
8           THE WITNESS: Okay. Well, I pull in the
9   parking lot. I couldn't pull in the parking lot. They
10  were all of the pickets out there. They had pickets
11  everywhere. Some of the guys, I know. I say: Oh, man.
12          I made a turn on the opposite side of the
13  street, like a U-turn, away from everybody.
14          Then a group of guys I worked with, they were
15  in the center dividing lane, and that's where things
16  happened.
17  Q.      So when you -- which particular parking lot
18  were you trying to pull into?
19          Let me try and orient you.
20  A.      Probably Gate 4, I believe.
21  Q.      The SSA gate?
22  A.      Yes.
23  Q.      What has been marked as 4 on the map?
24  A.      Right.
25  Q.      And that's the gate that you weren't able to

```
 1   get into because of the picketers?
 2   A.      Right.
 3   Q.      And so is that approximately, this place, this
 4   point marked as 4 on the map, is that approximately
 5   where you turned around, that you did your U-turn?
 6   A.      I turned in front of it, not in it.
 7   Q.      Before you got to 4?
 8   A.      Right.
 9   Q.      And you parked on the opposite side?
10   A.      Opposite side, where the railroad tracks are.
11   Q.      Off the road, near the tracks?
12   A.      Yes, off the side road.
13   Q.      And then you saw a bunch of folks you worked
14   with?
15   A.      Yeah.
16   Q.      Where were they standing?
17   A.      A center divider lane.
18           A couple of them parked their cars there.
19   There was a whole group of us.
20   Q.      Was it on Middle Harbor or Maritime?
21   A.      That is on Middle Harbor.
22   Q.      It was on Middle Harbor. It was before you
23   take this jog off into Maritime?
24   A.      Maritime? That's when you are coming off the
25   Bridge. We don't pass Maritime now. We are on
```

```
 1    Middle Harbor Road.
 2    Q.      You didn't go back when you parked your car?
 3    A.      No.  No.
 4    Q.      How many of your friends were parked -- were
 5    standing in the center?
 6    A.      It was a good group of us; 15, 20, 30.  I'm
 7    not sure; 25.
 8    Q.      And did you join them?
 9    A.      Yeah.
10    Q.      And when you first joined the group, there
11    were already 15 to 25 there?
12    A.      Yeah.
13    Q.      And what time was it then, approximately?
14    A.      Oh, 7:30, 25 til.  Rough guess.
15    Q.      Okay.  That's fine.
16    A.      Give or take, you know.
17    Q.      When we were talking before when you got off
18    the freeway and came down Maritime toward Middle Harbor,
19    I think you said it was 8:25.  Did you mean 7:25, or am
20    I --
21    A.      Okay, yeah.  You are right.  I was wrong.
22    Q.      That was a long time ago.
23            MR. NISENBAUM:  You mean 7:25?
24            THE WITNESS:  Yeah.  Yeah, 7:25.
25            MS. HUNEKE:  Q.  Okay.  When you joined the
```

1  Q.      Sure.
2          And then you saw some more protesters after
3  how long, coming down toward the --
4  A.      After we had been there for awhile. I don't
5  know; 15, 20 minutes, 25 minutes. I don't know.
6  They -- that's when it was protesters coming down, and
7  you could hear the motorcycles, and the police, and
8  stuff like that. That is when they got right up on us.
9  Q.      Do you have any estimate of how many
10 protesters were moving down toward the Number 4 gate
11 when you saw them?
12 A.      A good number.
13 Q.      150, 200, or less than that?
14 A.      That or more.
15 Q.      And were there protesters walking or running,
16 or doing both?
17 A.      At which point? At the gate in front of me,
18 or the ones coming down the street.
19 Q.      Good point.
20         The ones coming down the street?
21 A.      They was running.
22 Q.      And you said you also heard motorcycles?
23 A.      Yeah.
24 Q.      Is that the first time you had heard any
25 motorcycles that day?

```
 1   A.        (Witness nodding.)  It all happened at one
 2   time.  I mean, you know, when they meet, everybody is
 3   going.  The police was right behind them.
 4             Then the police shooting at us.
 5   Q.        Did you notice, before the police started
 6   shooting at you, whether the protesters had cleared Gate
 7   Number 4 and all left, or do you not know?
 8   A.        I am not sure, man.  All that happened all at
 9   one time.
10   Q.        That's fine.
11             So when you saw the protesters running up
12   Middle Harbor Road toward you, what, if anything, did
13   you do?
14   A.        We was standing on the side; figured that
15   everybody -- they gone by us.  Everybody that was going
16   by -- there was a side street.  We are in the middle.
17   Then when the police got closer, they started shooting
18   at us.
19   Q.        So when you first saw the protesters, you
20   weren't thinking we had better get out of here?
21   A.        No.  I thought we were all right.  We were
22   standing by to go to work.  We weren't with the
23   protesters.  We were separate.
24   Q.        How long did it take the protesters to move
25   into the gate -- to the Gate 4 area -- from the time you
```

```
 1   Q.        I am sorry about that.
 2             Your group of workers?
 3   A.        It was mainly men.
 4   Q.        Did any of your group of workers standing with
 5   you leave when they saw the protesters?
 6   A.        No.  We all stood there.  We was waiting on
 7   standby.
 8   Q.        At some point after the protesters had passed,
 9   the police started firing at your group?
10   A.        Right.
11   Q.        And did you see the police fire at your group?
12   A.        I just didn't see them.  I got hit.  They hit
13   me in the groin and they shot one of my friends.  He was
14   standing.  They shot him in the back.  He fell down to
15   the ground.  And the only time -- we all running around,
16   and I got shot in the back.  Then they shot a buddy,
17   Brian Moore.  He trying to get in the car.  The police
18   shot him point blank, right up on him.
19   Q.        All right.  So do you know whether you were
20   the first person hit in that group?
21   A.        I -- we got almost -- all got shot at the same
22   time.  It was like one bullet.  He was busting bullets,
23   coming at us.
24             MS. HUNEKE:  Take a little break.
25                  (Short break.)
```

```
 1   shot.
 2   Q.         Again, what part of your back was it?
 3   A.         On the left side, over my kidney.
 4   Q.         And did that cause you to fall to the ground,
 5   or to your knees, or anything like that?
 6   A.         No, I didn't fall.  But it -- it knocked the
 7   skin off my back.
 8   Q.         And did it -- were you wearing a jacket or
 9   something that day?
10   A.         A sweatshirt and a light jacket; probably had
11   a T-shirt under, and a work shirt.
12   Q.         What color was your jacket; do you remember?
13   A.         Oh, it's green.  It was like -- kind of like
14   this.  Kind of like different of colors, checkers.
15   Q.         Kind of the same color green, kind of dark
16   green?
17   A.         Yeah.
18   Q.         Darkish, with some kind of pattern on it?
19   A.         (Witness nodding.)
20   Q.         What color was your sweatshirt?
21   A.         Gray.
22   Q.         Light gray, dark gray?
23   A.         49er gray.
24              MR. NISENBAUM:  I am a Raider fan.  That could
25   be a minority here.
```

```
 1              THE WITNESS:  We go there every day at work.
 2    Half are Raider fans; half 49er fans.
 3              MS. HUNEKE:  Q.  I was going to ask:  What is
 4    the percentage of that?
 5         A.   50 percent.  We don't back down.
 6         Q.   It was not a happy year for 49ers last year?
 7         A.   We had a long season, too long.
 8         Q.   Were you wearing -- what color pants were you
 9    wearing?
10         A.   Probably some jeans.  I think it was like
11    regular jeans.
12         Q.   Do you still have the jeans?
13         A.   Oh, I probably still do.  I couldn't tell you
14    which pair it is.
15         Q.   There were no marks on the jeans?
16         A.   I wasn't hit in the jean area.
17              Oh, yeah, I was.  You are right.  On the
18    groin, yeah.
19              Was it a mark?  It might have been -- no.  I
20    don't think so, because it didn't draw no blood.  It was
21    real like -- real purple like, you know.  Somebody get a
22    black eye.  It was real dark.
23         Q.   Very dark bruise?
24         A.   Yeah.
25         Q.   How big was the bruise?  I am talking about
```

1    I, ANNETTE M. SNYDER, a Certified Shorthand
2    Reporter of the State of California, hereby certify
3    that the witness, ALLEN CHAPMAN, in the foregoing
4    deposition was by me duly sworn to testify to the
5    truth, the whole truth and nothing but the truth in the
6    within-entitled cause; that said deposition was taken
7    at the time and place therein stated; that the
8    testimony of the said witness was reported by me and
9    thereafter transcribed under my direction; that the
10   foregoing is a complete and true record of the said
11   testimony; and that the witness was given an
12   opportunity to read and correct said deposition and to
13   subscribe the same.

14   I further certify that I am not of counsel
15   or attorney for either or any of the parties in the
16   foregoing deposition and caption named, or in any way
17   interested in the outcome of the cause named in said
18   caption.

19   IN WITNESS THEREOF, I have hereunto set my
20   hand on May 4, 2005.

ANNETTE M. SNYDER, CSR NO. 1880