1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**Declaration of Gregory M. Fox**
**EXHIBIT F** ( 14 pages from Kurzrock Depo)

27
28

COPY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LOCAL 10, INTERNATIONAL
LONGSHORE AND WAREHOUSE UNION,
et al.,

        Plaintiffs,

-vs-                           NO. C 03-2962 TEH (JL)

CITY OF OAKLAND, et al.,

        Defendants.

            DEPOSITION OF JULIA BABKA-KURZROCK

DATE:          Friday, September 16, 2005

TIME:         1:20 p.m. (Noticed for 1:00 p.m.)

LOCATION:      Law Offices of James B. Chanin
               3050 Shattuck Avenue
               Berkeley, CA 94705

REPORTED BY:   Georgia A. Wright
               Certified Shorthand Reporter
               License No. 1542


                GEORGIA A. WRIGHT
          Certified Shorthand Reporter
             748 Pinedale Court
           Hayward, CA 94544-1025
      510.886.3352   wrightga@juno.com

DEPOSITION OF JULIA BABKA-KURZROCK

```
 1   ahead of that on the way to number 5 you had asked me where I
 2   was.  I was in the back of the officers who were ahead of me.
 3   We were between these two points.
 4        Q.   4 and 5?
 5        A.   Yes.
 6        Q.   Okay.  That's where the arrest took place?
 7        A.   Yes.
 8        Q.   Okay.  Can you put a C, as best you can recall,
 9   where the arrest took place?
10        A.   (Witness marks diagram)
11        Q.   Okay.  Now, was this before or after you did the
12   arrests or your team did the arrests at point B?
13        A.   After or during, I guess you would say.  It was in
14   the middle of everything.
15        Q.   The middle of everything?
16        A.   Yes.
17        Q.   Okay.  So, what first brought your attention to
18   Mr. Heyman?
19        A.   His vehicle.
20        Q.   Okay.  What was it doing?
21        A.   It was almost right in my immediate right-hand side
22   within -- almost parallel to me and coming into my line of
23   sight on my right.
24        Q.   Okay.
25        A.   Which told me that instead of patrol cars and paddy
```

38

GEORGIA A. WRIGHT, CSR    #1542

DEPOSITION OF JULIA BABKA-KURZROCK

1  wagons behind me a car had gotten through the line.
2      Q.   Do you know how the car had gotten through the line?
3      A.   No.  It was really obvious Mr. Heyman was the man
4  who was driving it.  That's all.  He must have negotiated it
5  and passed up the officers.
6      Q.   So, you believe Mr. Heyman had negotiated passage
7  through at least one police line at that point?
8      A.   Through several police cars and commander cars and
9  the paddy wagon; yes.
10     Q.   Okay.  And you saw his car out of the corner of your
11 eye?
12     A.   Correct.
13     Q.   Okay.  What is the very next thing that you did?
14         MR. FOX:  Just for the record, she made a motion to
15 her right eye.
16         MR. CHANIN:  Right.
17         THE WITNESS:  The very next thing that I did is I
18 turned around and I started yelling at the driver to stop his
19 car.  "Stop your car".  I started walking towards him.
20         MR. CHANIN:
21     Q.   Okay.  Was the car moving at that point?
22     A.   Yes.
23     Q.   Okay.  When you first saw it, was it moving?
24     A.   Yes.
25     Q.   Okay.  How fast was it going?

39

GEORGIA A. WRIGHT, CSR    #1542

DEPOSITION OF JULIA BABKA-KURZROCK

```
 1      A.   Probably 5, 10 miles per hour.
 2      Q.   Okay.  How many feet from the curb was it?
 3      A.   It was in what we call the number 2 lane.  It's a
 4 pretty wide street out there and I don't know how far it was
 5 from the curb, so, he was clearly in the traffic lane, you
 6 know, in the roadway.
 7      Q.   Okay.  So, you call the number 2 lane -- I think I
 8 know what you mean, but I want to go through it.  Okay?
 9 What's the number 1 lane?
10      A.   The one closest to the center divide.
11      Q.   What's the number 2 lane?
12      A.   The one to the right of that.
13      Q.   How many lanes were there on that roadway?
14      A.   Two.
15      Q.   Okay.  So, he was driving down the number 2 lane?
16      A.   Correct.
17      Q.   How many feet was he from the curb to his right when
18 you first saw him?
19      A.   I don't know.  As I said earlier, I don't know how
20 far he was from the curb.  He was in the lane.
21      Q.   How far from you was the car when you first -- what
22 did you yell at him again?
23      A.   "Stop your car.  Stop driving."
24      Q.   How far was he from you at that point?
25      A.   About a lane and a half away.
```

40

DEPOSITION OF JULIA BABKA-KURZROCK

1   Q.  Okay.  Was there anyone between you and him?
2   A.  I don't remember anybody being between us at all;
3   no.
4   Q.  Okay.  And were there other officers in the
5   vicinity?
6   A.  Yes.  They were all in front of me.
7   Q.  There were no officers behind you?
8   A.  Just in vehicles.  There might have been one
9   sergeant kind of behind me, but like in a curved line off to
10  the left dealing with stuff that was happening on the
11  left-hand side because the road spread out there and there's
12  like a gate you are coming up to and some kind of parking
13  area.  And I guess you could say he was a little bit behind me
14  in that sense.
15  Q.  Okay.  When you yelled at him to stop the car,
16  what's the next thing that happened?
17  A.  He didn't stop.  I said it over and over and over
18  again.  He just didn't stop.  He was talking on his cell phone
19  and quickly answering me he had to get -- keep going.  He had
20  to get to his people.  He wasn't really talking to me.  He was
21  talking on his cell phone the whole time, and he just kept
22  driving.
23  Q.  The record will speak for itself what you just said,
24  but did you have the impression that he was saying something
25  to you?

41

GEORGIA A. WRIGHT, CSR    #1542

DEPOSITION OF JULIA BABKA-KURZROCK

```
 1      A.   Oh, yeah -- yes.  Definitely.
 2      Q.   What was he saying to you?
 3      A.   "I have to get through.  I'm a union leader" or
 4   representative.  Something with the union.  And, "Those are my
 5   people.  I have to get to them."  I kept telling him, "You
 6   can't get to them.  There's motor officers ahead of you."  I
 7   was walking very quickly with his car telling him, "You have
 8   to stop."  My voice was getting louder and louder.
 9      Q.   Was he moving all this time?
10      A.   Oh, yeah.  He never stopped at this point.
11      Q.   Okay.  Now, when you first saw him, how far was he
12   from this line of motor officers?
13      A.   Wow.  When I first saw him?  I don't think I can
14   remember.  I could go out there and pace it off.
15      Q.   If you don't remember, that's fine.
16      A.   I don't.  I can see him.  When I first saw him is
17   when he caught up with my vision.
18      Q.   When you told him to stop, how far was he from --
19   the first time, how far was he from the motorcycle officers?
20      A.   That's the same question; right?  And I don't
21   remember how far away that was.
22      Q.   All right.  You told him to stop numerous times?
23      A.   Yes, I did.
24      Q.   Do you have an estimate of how many times?
25      A.   At least ten before he started pulling his car off
```

42

GEORGIA A. WRIGHT, CSR    #1542

DEPOSITION OF JULIA BABKA-KURZROCK

```
 1  closer and closer to the right-hand shoulder.
 2       Q.  Okay.  So, he started pulling to the curb?
 3       A.  Yes, but he kept driving.
 4       Q.  Okay.  And do you know why he did that?
 5       A.  I think he was trying to kind of accommodate me and
 6  speak to me, but he was still talking on the phone.  I can
 7  only guess that's what he was kind of doing.
 8       Q.  I don't want you to guess.  That's why I said know,
 9  K-N-O-W.
10       A.  Oh!
11       Q.  So, basically, describe to me how he pulled his car
12  over in the manner you described a little bit once you gave
13  him these commands.
14       A.  Well, I'm with a group of people who are sort of
15  trying to occupy the whole center of the roadway.  I'm one of
16  the people on the furthest right-hand side and in the back,
17  and there's cars behind me.  Now he comes up on my right and
18  starts to pass me.  And as I talk to him and start walking
19  towards him, he drives forward, but he starts pulling away
20  from my direction closer to the curb.  So, I have to walk
21  further over to talk to him.
22       Q.  Did he slow his vehicle down?
23       A.  No.  He was driving very slowly to begin with.  It
24  was very slow.  He was negotiating, as I said, in between all
25  of us.
```

43

GEORGIA A. WRIGHT, CSR     #1542

DEPOSITION OF JULIA BABKA-KURZROCK

1   Q.   Okay.  And when he pulled -- started pulling over to
2  the curb, did he slow down even more?
3   A.   Eventually, yes, he did.
4   Q.   Okay.  And were you still talking to him during that
5  time?
6   A.   Yes, I was.
7   Q.   Okay.  And what's the next thing that happened?
8   A.   Well, the conversation never ended until he actually
9  stopped the car for a second and I reached inside of it.
10   Q.   Okay.
11   A.   At that point he had stopped for a second.  I
12  remember catching myself going I could get hurt.  I just got a
13  friend who was injured very badly doing that.  And I remember
14  he went forward again after I told him to stop and I thought I
15  had his cooperation at that point.
16   Q.   Okay.  Let's slow down here for a second because I
17  don't want to go over and over again the same thing.  So, he's
18  pulling over and slowing down.  You're moving toward him.
19   A.   Yes.
20   Q.   Okay.  And then he stops the car?
21   A.   When I catch up to him, he stopped the car.
22   Q.   How far from him were you when he stopped the car?
23   A.   I was at the door.  I was right next to the car when
24  he stopped.
25   Q.   Okay.  What's the very next thing that happened?

44

GEORGIA A. WRIGHT, CSR    #1542

DEPOSITION OF JULIA BABKA-KURZROCK

```
 1      A.   Then it stopped.
 2      Q.   Okay.  Where were you in terms of your hands and
 3 your body when the car stopped that first time?
 4      A.   Then I was outside of the car, completely outside of
 5 the car talking to him.
 6      Q.   And your hands were not in the car?
 7      A.   No.
 8      Q.   How far were you from the car?
 9      A.   Standing right next to the driver's door trying to
10 stay ahead of him.
11           Can we go off the record a minute?
12           MR. CHANIN:  Yes.
13           (Cell phone interruption)
14           MR. CHANIN:  Okay.  We're back on the record.
15      Q.   So, did you put any part of your body in the car
16 before it stopped the first time?
17      A.   Probably.  Yeah, my hand started to go in the window
18 and I had that second thought like I shouldn't do this.  So,
19 I'm sure it crossed the threshold of the window.  But I didn't
20 move any other part of my body except for my hand in.
21      Q.   All right.  What's the next thing that happened
22 after the car stopped?
23      A.   Now you are jumping to when he finally stopped?
24      Q.   No.  The first stop you just --
25      A.   Put my hand.
```

46

GEORGIA A. WRIGHT, CSR    #1542

DEPOSITION OF JULIA BABKA-KURZROCK

```
 1      Q.    -- thought about putting your hand in the window.
 2   Maybe you did a little bit.
 3      A.    Yes, definitely.
 4      Q.    Maybe you thought better of it.  What's the next
 5   thing that happened?
 6      A.    He drove forward again, not very far.
 7      Q.    How far?
 8      A.    A few feet talking on the phone still.  Sort of
 9   like, I don't know if he was tapping his brake, that kind of
10   forward moving.  It wasn't very fast, but he wasn't stopping
11   either.  And then he stopped long enough that I felt the car
12   was going to stay at rest.
13      Q.    Okay.  What did you do during the period when he
14   drove those few feet?
15      A.    I kept telling him, "You have to stop your car.  You
16   have to stop your car."
17      Q.    Okay.  How many feet is a few feet?
18      A.    I think we walked -- I walked probably 8, 10 feet
19   alongside of his car while it was moving at least.
20      Q.    Now, the car stops again?
21      A.    Yes.
22      Q.    What's the next thing that happens?
23      A.    He was talking on the phone still and he wasn't
24   listening to me.  And I used that opportunity against better
25   judgment to reach in and turn off his car, which he started
```

47

GEORGIA A. WRIGHT, CSR    #1542

DEPOSITION OF JULIA BABKA-KURZROCK

1  quickly doing at the same time. You know, both of us -- I
2  think he saw what I was doing, and maybe was going to stop me
3  or help me or something. I'm not sure. And I turned off his
4  car.
5      Q.  Okay.
6      A.  And you want to ask the next question?
7      Q.  Okay. So, the car is stopped, you used the
8  opportunity to turn off his car. He put his hands down in
9  that area. Your impression maybe he was trying to help you?
10     A.  I thought maybe with his right hand he was going to
11 stop the car, but he didn't. And that's why I did it.
12     Q.  Okay. So, you turned off the car?
13     A.  Yeah. I turned off the car.
14     Q.  Okay. So, what's the next thing that happened?
15     A.  I was going to arrest him for failure, you know, for
16 obeying my orders. I started to open the car door and Officer
17 Mack arrived. Said something like, "Hey, Sarge, I'll take
18 care of this," or, "I'll handle this for you, Sarge,"
19 something like that.
20     Q.  Before we get to that point, I want to ask you a few
21 more questions. When had you decided to arrest him?
22     A.  When he stopped -- when he refused to stop his car.
23 After the --
24     Q.  Go ahead.
25     A.  After the first time when I thought he was going to

48

GEORGIA A. WRIGHT, CSR    #1542

DEPOSITION OF JULIA BABKA-KURZROCK

```
 1   it."  I mean, I told him all that stuff to make sure he was
 2   clear on everything.  I was the arresting officer.  I ordered
 3   the arrest, I made the arrest.  The assisting officer was
 4   Officer Mack.  Once we had all that information, I said, "We
 5   will get all the paperwork straightened out" -- whatever they
 6   call it -- "at the rally point."
 7        Q.   When did you order the arrest?
 8        A.   I made the arrest when I told him to stop the car
 9   and Officer Mack came over.  He was in custody at that point.
10   In my mind he was under arrest as soon as he failed to stop
11   his car.  That was when he was under arrest.
12        Q.   The very first time?
13        A.   Yes.  That's the technical question.  He was under
14   arrest as soon as he kept on driving.  Taking him into custody
15   was when he was pulled out of the car and handcuffed.
16        Q.   All right.  Now, what I want to know is, you just
17   said a few minutes ago that you ordered his arrest; okay?
18        A.   Yes.
19        Q.   Even less than a few minutes ago.  Did you order his
20   arrest?
21        A.   Yeah.  The officer wanted to know who was
22   responsible.  That was the question.  And I said yes, it was
23   me.  I didn't say yes.  I said it was me.  As a matter of
24   fact, it's my arrest because they need to know who was the
25   supervisor who was there as well as who the officer was.
```

58

DEPOSITION OF JULIA BABKA-KURZROCK

```
 1        Q.   Did you ever say at the scene "arrest him" or "get
 2   him"?
 3        A.   No.  I didn't have to.
 4        Q.   Pardon me?
 5        A.   I didn't have to.
 6        Q.   All right.  Did you ever tell Mr. Heyman that he was
 7   going to be arrested if he continued to drive the car?
 8        A.   Yes.
 9        Q.   You did?
10        A.   Yes.
11        Q.   When?
12        A.   Probably 10 or 20 times.  This whole time he was
13   driving I told him he had to stop driving.  He couldn't drive
14   through the police lines, he was going to be arrested.  He
15   kept telling me he was an important official.  His people were
16   hurt.  It was like a circular argument that was going nowhere
17   and the car kept on moving.  And once the car was turned off,
18   we took him into custody.
19        Q.   Okay.  Did you ever hear anyone else say, "Get him"?
20        A.   No.
21        Q.   Did you ever hear anyone say, "Get that ILWU fuck"?
22        A.   Absolutely not.  No way.  That wasn't said.
23        Q.   Just a couple of other points.  Here on this arrest
24   at the very beginning of your police report you said -- is
25   that it?  No.  You can read it.  That's fine.  "I was working
```

59

GEORGIA A. WRIGHT, CSR    #1542

DEPOSITION OF JULIA BABKA-KURZROCK

```
 1         I, GEORGIA A. WRIGHT, a Certified Shorthand Reporter
 2   in an d for the State of California, hereby certify that the
 3   witness in the foregoing deposition,
 4              JULIA BABKA-KURZROCK
 5   was by me duly sworn to tell the truth, the whole truth and
 6   nothing but the truth in the within-entitled cause, that the
 7   foregoing is a full, true and correct transcript of the
 8   proceedings had at the taking of said deposition to the best
 9   of my ability.
10   Date:_____October 4_____, 2005
11
12
13                   GEORGIA A. WRIGHT, NO. 1542
14         The signing of the deposition of the deponent was
15   conditionally waived at the time of the taking of the
16   deposition.
17   _____
18         Upon completion of the foregoing transcript, the
19   witness was notified it was ready for signature, but the
20   deposition was not signed by the witness for the following
21   reason:
22   _____
23   _____
24   _____
25
                                                              84
```